# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 29, 2013

Lyle W. Cayce
Clerk

Nos. 11-41376 c/w 11-41392

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

v.

NORBERTO ALANIZ; JOSEFINA GALAVIZ; MAYRA LOPEZ; YESICA
MAGANA; LEANDRO SALAS-GALAVIZ, also known as Daniel Obregon, also
known as Lic,

                                        Defendants-Appellants.

---

Appeals from the United States District Court
for the Southern District of Texas

---

Before STEWART, Chief Judge, and BENAVIDES and HIGGINSON, Circuit
Judges.

CARL E. STEWART, Chief Judge:

Defendants-Appellants, Salas-Galaviz ("Salas"), Alaniz, Lopez, Galaviz,
and Magana appeal their convictions and sentences for drug trafficking, money
laundering, and conspiracy thereof.[1]  For the reasons provided herein, we wholly
AFFIRM Alaniz's convictions and sentences.  Due to a Sentencing Guidelines
error conceded by the government, we VACATE the sentences of Salas and the

---

[1] We collectively refer to all Defendants-Appellants as the "Appellants." We collectively
refer to Lopez, Galaviz, and Magana only as the "Money Laundering" or "ML Appellants."

Nos. 11-41376 c/w 11-41392

ML Appellants as to Count 10 only, and REMAND for re-sentencing. We otherwise AFFIRM the convictions and sentences in full.

## BACKGROUND

### A.    Salas

Salas is an illegal immigrant from Mexico who cannot speak or understand English. During most of the period at issue in this case, Salas resided in Laredo, Texas, where he used an "assumed Social Security number" and the criminal alias "Daniel Obregon." Salas was apprehended in January 2010 as part of the joint DEA/IRS "Operation Reload," which targeted U.S. appendages of the Mexican drug cartels, Los Zetas and the Gulf Cartel.

Salas was convicted of running a large-scale cocaine and marijuana trafficking operation out of Laredo—an epicenter of U.S.-Mexico drug trafficking—while ostensibly working as a Spanish-language car salesman. Before moving to Laredo and displaying sudden, large amounts of wealth, Salas worked behind the counter at a Krispy Kreme Doughnuts in Dallas. The district court found that Salas moved from Dallas to Laredo, at the behest of Los Zetas and the Gulf Cartel, where he organized and led a drug trafficking operation from the Laredo border to various points throughout the United States.

### B.    Alaniz

Alaniz, who is not related to Salas, was one of more than two-dozen individuals who worked for Salas as a drug transporter.[2] He was apprehended in Texas on July 18, 2006 with a tractor-trailer full of drugs. Alaniz previously was convicted of similar drug trafficking offenses to those charged in this case.

### C.    The ML Appellants

Lopez is Salas's wife, Galaviz is Salas's mother, and Magana is Salas's younger sister. The three laundered drug trafficking proceeds for Salas.

---

[2] The other transporters either pled guilty and cooperated, or were subject to trial in other federal district courts. They are not party to this appeal.

2

Lopez lived with Salas in Laredo, while Galaviz lived with Magana in the vicinity of Dallas.  Magana claimed Galaviz as a federal tax dependant.

### D.     The Money Laundering Conspiracy

To launder his drug trafficking proceeds, Salas ran a sham construction company called "LC Contractors."  Lopez ran a sham import-export business called "Via Italia Devine."  Galaviz bought and sold real estate, and Magana bought and sold motor vehicles.

In all, Salas accrued $1,913,937 in drug trafficking proceeds between 2002 and 2009, which he and the ML Appellants laundered through 38 bank accounts. Lopez, Galaviz, and Magana were apprehended with Salas in January 2010.

### E.     Procedural History

On June 8, 2010, Appellants were charged by a sixteen-count indictment. Appellants proceeded to a joint jury trial, where the prosecutor, in part, relied on the testimony of confidential informants, Ester Ramirez and Roberto Garcia.[3]

Collectively, Appellants were convicted on thirteen of the sixteen counts. Salas was sentenced to life imprisonment, Alaniz to 30 years imprisonment, and each of the ML Appellants to 11 years, 3 months imprisonment.[4]  In addition to the prison terms, the district court imposed substantial fines and forfeitures.

## DISCUSSION

### I.     Sufficiency of the Evidence Challenges

The ML Appellants all raise sufficiency of the evidence challenges on appeal, with respect to both their conspiracy and substantive money laundering convictions.  All three were convicted of conspiracy under Count 10 of the

---

[3] Both "Ester Ramirez" and "Roberto Garcia" were aliases under which the district court allowed the two informants to testify.  In their briefs, the parties refer to Ramirez as "Confidential Source" or "CS1" and Garcia as "CS2."  We do the same.

[4] For ease of reference, we have included charts documenting the counts charged and the convictions and sentences imposed in an Appendix at the end of this opinion.

Nos. 11-41376 c/w 11-41392

indictment. Lopez was convicted of substantive money laundering under Count 11, Galaviz under Counts 13 and 14, and Magana under Count 12.

Upon review, we conclude the evidence was plentiful that all three Appellants (i) experienced sudden wealth in the form of property valued at more than $10,000; (ii) knew the property came from Salas's unlawful drug trafficking; and (iii) implicitly agreed to launder the property in order to facilitate Salas's trafficking.

### A.    Standard of Review

"This court reviews preserved challenges to the sufficiency of the evidence de novo." *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012) (citation omitted).[5] "When reviewing the sufficiency of the evidence, we view all evidence, whether circumstantial or direct, in the light most favorable to the government, with all reasonable inferences and credibility choices to be made in support of the jury's verdict." *United States v. Ford*, 558 F.3d 371, 375 (5th Cir. 2009) (per curiam) (citation omitted).

"A jury is free to choose among reasonable constructions of the evidence." *United States v. Pigrum*, 922 F.2d 249, 254 (5th Cir. 1991). "It is not necessary that the evidence exclude every rational hypothesis of innocence or be wholly inconsistent with every conclusion except guilt, provided a reasonable trier of fact could find the evidence establishes guilt beyond a reasonable doubt." *United States v. Valdez*, 453 F.3d 252, 256 (5th Cir. 2006) (citation and internal quotation marks omitted).

In all, this Court's "inquiry is limited to whether the jury's verdict was reasonable, not whether we believe it to be correct." *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011) (citation and internal quotation

---

[5] All three ML Appellants properly preserved their challenges for appeal.

marks omitted). This inquiry "is highly deferential to the verdict." *United States v. Harris*, 293 F.3d 863, 869 (5th Cir. 2002).

"Circumstantial evidence may establish the existence of a conspiracy, as well as an individual's voluntary participation in it, and circumstances altogether inconclusive, if separately considered, may, by their number and joint operation . . . be sufficient to constitute conclusive proof." *United States v. Fernandez*, 559 F.3d 303, 315 (5th Cir. 2009) (citations and internal quotation marks omitted) (alterations in original).

### B.    Applicable Law

#### 1.    Conspiracy Charges

Count 10 charged the three ML Appellants, as well as Salas, with: (i) the concealment of drug trafficking proceeds; (ii) in order to avoid a reporting requirement; (iii) by moving funds outside the United States and engaging in monetary transactions of a value greater than $10,000 through a financial institution. This amounted to a charge for conspiracy to commit money laundering in violation, *inter alia*, of 18 U.S.C. § 1956(h).

The elements of a conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), are: (i) "that there was an agreement between two or more persons to commit money laundering"; and (ii) "that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose." *United States v. Fuchs*, 467 F.3d 889, 906 (5th Cir. 2006) (citations omitted). "The government need not prove an overt act in furtherance of the conspiracy." *Id.* (citing *Whitfield v. United States*, 543 U.S. 209, 219 (2005)).

"It is settled law that conspiring to commit a crime is an offense wholly separate from the crime which is the object of the conspiracy." *United States v. Threadgill*, 172 F.3d 357, 367 (5th Cir. 1999) (citation omitted). "Thus, we have consistently held that a conspiracy charge need not include the elements of the substantive offense the defendant may have conspired to commit." *Id.* (citations

5

omitted). "Evidence that a defendant's cash outflow in a financial transaction exceeds [her] legitimate income is sufficient to show that the transaction involves the proceeds of specified unlawful activity, even if the defendant claims income from other sources." *United States v. Westbrook*, 119 F.3d 1176, 1191 (5th Cir. 1997) (citation and internal quotation marks omitted).

### 2.    Substantive Money Laundering Charges

Count 11 charged Lopez with knowingly laundering $15,000 in unlawfully derived property from a Wells Fargo account on April 17, 2007. Count 13 charged Galaviz with knowingly laundering $30,000 in unlawfully derived property, by means of a Laredo National Bank cashier's check, on or about January 23, 2008. Count 14 charged Galaviz with knowingly laundering $48,304.31 in unlawfully derived property, by means of a check drawn from BBVA Compass Account No. 1782, on or about April 17, 2008. Count 12 charged Magana with knowingly laundering $15,000 in unlawfully derived property, on or about March 29, 2007, by making a payment on Salas's house in Laredo using a check drawn on Chase Account No. 7697. These amounted to charges for money laundering in violation, *inter alia*, of 18 U.S.C. § 1957(a).

The elements of money laundering, in violation of 18 U.S.C. § 1957(a), are: (i) "property valued at more than $10,000 that was derived from a specified unlawful activity"; (ii) "the defendant's engagement in a financial transaction with the property"; and (iii) "the defendant's knowledge that the property was derived from unlawful activity." *Fuchs*, 467 F.3d at 907 (citations omitted).[6]

"Unlawfully" or "criminally derived property" is "property constituting, or derived from, proceeds obtained from a criminal offense," such as drug

---

[6] We emphasize that the knowledge inquiry looks only to whether the property was derived from an "unlawful activity." Accordingly, the *mens rea* element of the offense does not extend to whether the defendant knowingly laundered the funds, only whether the defendant knew the funds were illicit and engaged in a "financial transaction" with them regardless.

trafficking. *See* 18 U.S.C. § 1957(f)(2). A "financial" or "monetary transaction" is "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution," but "does not include any transaction necessary to preserve a person's right to representation as guaranteed by the [S]ixth [A]mendment to the Constitution." *Id.* § 1957(f)(1).

### C.    Analysis

#### 1.    Lopez

##### a.    Evidence of Sudden Wealth

Lopez is Salas's wife. From 2005 through 2009, Salas reported income of approximately $30,000 in total. However, his bank accounts showed cash deposits and wire transfers of approximately $761,000. Between 2002 and 2008, Lopez and Salas went from living in a one-bedroom rental apartment to building a house valued at approximately $500,000. During that period, they reported a combined total income of less than $50,000.

Lopez herself was an occasional seller of Mary Kay and Avon products. Prior to 2008, she had earned $12,000 in total from Mary Kay sales and $5000 in total from Avon sales. Lopez otherwise had no meaningful income from any source between 2003 and 2009. Nevertheless, her bank accounts showed cash deposits and wire transfers totaling $361,934 during that period.

Finally, in 2008, Via Italia—Lopez's ostensible import-export business—reported a loss of approximately $48,000. During that same year, it received cash deposits and wire transfers of approximately $61,800.

Together, this evidence demonstrates that Lopez experienced sudden wealth in the form of property valued at more than $10,000.

##### b.    Evidence of Knowledge of Drug Trafficking

Between 2002 and 2009, the record reflects instances where Lopez knew that Salas was using the alias "Daniel Obregon." Moreover, on May 24, 2007,

Lopez expressly told CS1 that she was going to Dallas, on behalf of Salas, to retrieve drug proceeds and return them to Laredo. Salas then added, in Lopez's presence, that Alaniz had transported drugs for him before his apprehension. Finally, on March 28, 2008, Lopez confided to CS1 that LC Contractors (Salas's construction company) was not in business "to make money." If not in business "to make money," it stands to reason LC Contractors actually was in business to front for Salas's drug trafficking.

In light of this evidence, a reasonable jury could infer that Lopez knew that her sudden wealth came or derived from Salas's drug trafficking, an unlawful activity.

### c.  Evidence of an Implicit Agreement to Launder Funds Derived from Salas's Trafficking

Between May 2008 and June 2008, Lopez withdrew $35,000 from an account with IBC Bank in the name of Via Italia. She used the $35,000 to purchase a certificate of deposit ("CD"), and then used the CD as collateral for a loan of approximately the same amount. This transaction had no conceivable purpose other than the intentional obscurement of the $35,000's initial source.

In light of Lopez's knowledge that she had obtained property in excess of $10,000, and that the property was derived from Salas's unlawful drug trafficking, Lopez's intentional obscurement of the $35,000 could permit a reasonable jury to infer that Lopez implicitly agreed to launder the source of the property for Salas in order to facilitate his drug trafficking.

### d.  Conclusion

Based on the above evidence, it was reasonable for the jury to conclude that Lopez conspired to launder Salas's drug trafficking proceeds in violation, *inter alia*, of 18 U.S.C. § 1956(h).

On April 17, 2007, Lopez made a $15,000 payment to Chrysler Financial, from Wells Fargo Bank Account No. 3431, towards a Dodge Durango truck used

Nos. 11-41376 c/w 11-41392

by Salas. For the reasons stated above, Lopez knew that the $15,000 was drug trafficking proceeds. Accordingly, it was reasonable for the jury to conclude that Lopez laundered Salas's drug trafficking proceeds in violation, *inter alia*, of 18 U.S.C. § 1957(a).[7]

### 2.    Galaviz

#### a.    Evidence of Sudden Wealth

Galaviz is Salas's mother. From 2002 through 2008, Galaviz reported less than $18,000 in income, but received $509,665 in wire transfers and cash deposits into the seven different bank accounts that she controlled.

This evidence demonstrates that Galaviz experienced sudden wealth in the form of property valued at more than $10,000.

#### b.    Evidence of Knowledge of Drug Trafficking

Galaviz received multiple wire transfers from individuals residing in Mexico, who the trial record implies are drug traffickers. Notably, BBVA Compass Bank Account No. 1782 received $245,995 in international wire transfers from three such individuals: Hilario Martinez-Garcia, Jesus Garza-Rodriguez, and Hector Vicente Becerra. $32,000 of those transferred funds arrived from Mexico shortly after Galaviz opened the account. The account also received $38,000 in cash deposits. Similarly, IBC Account No. 0654 received two international wire transfers, totaling $27,970, from Alejandro Lara-Davila, another individual in Mexico who the trial record implies is a trafficker.

On the day that Galaviz opened it, Wells Fargo Account No. 1432 received a $50,000 wire transfer from Lara-Davila. Galaviz used the $50,000 to buy a CD on April 25, 2007. When the CD matured, Galaviz wired $52,500 from the account to Salas. The account also received $43,500 in cash deposits.

---

[7] All three ML Appellants waived any challenges to whether the transactions underlying their convictions were "financial transactions."

Nos. 11-41376 c/w 11-41392

In light of this evidence, a reasonable jury could infer that Galaviz knew that her sudden wealth came or derived from Salas's drug trafficking, an unlawful activity.

### c.    Evidence of an Implicit Agreement to Launder Funds Derived from Salas's Trafficking

In April 2007, Galaviz wired $52,130.51 to Magana who, in turn, wired $58,692 back to Galaviz in July 2008.  On January 17, 2008, Galaviz wired $33,000 to herself, from a Wells Fargo account she controlled to BBVA Compass Account No. 1782.  Later that year, on June 25, 2008, Galaviz opened BBVA Compass Account No. 6826 with a $136,147.60 transfer from Account No. 1782. These transfers served no apparent purpose other than the intentional obscurement of the initial sources of the transferred funds.

In light of Galaviz's knowledge that she had obtained property in excess of $10,000, and that the property was derived from Salas's drug trafficking, Galaviz's intentional obscurement of the above-described funds could permit a reasonable jury to infer that Galaviz implicitly agreed to launder the source of the property for Salas.

### d.    Conclusion

Based on the above evidence, it was reasonable for the jury to conclude that Galaviz conspired to launder Salas's drug trafficking proceeds in violation, *inter alia*, of 18 U.S.C. § 1956(h).

### e.    Challenge to Count 14

On January 17, 2008, Galaviz wired $33,000 from Wells Fargo Account No. 1432 to BBVA Compass Account No. 1782.  On or about January 23, 2008, Galaviz used those funds to purchase a $30,000 cashier's check from Laredo National Bank.  Galaviz used the cashier's check to make the down payment on a house she purchased from Salas in Laredo's Patron Loop neighborhood.  As part of the transaction, Galaviz financed $120,000, and falsely referred to Salas

10

Nos. 11-41376 c/w 11-41392

as "Daniel Obregon" in the attendant documentation. Through December 2009, Galaviz made payments on the house approximating $29,000 from two BBVA Compass accounts. At that time, after less than two years had passed, Galaviz sold the house for a $140,071 profit. For the reasons stated above, Galaviz knew that the $30,000 cashier's check was funded with drug trafficking proceeds. Accordingly, with respect to Count 13, it was reasonable for the jury to conclude that Galaviz laundered Salas's trafficking proceeds in violation, *inter alia*, of 18 U.S.C. § 1957(a).

On April 16, 2008, Galaviz drew a check for $48,304.31 on BBVA Compass Account No. 1782. The following day, Galaviz used the funds to purchase a lot with Salas in Laredo's Deer Ridge neighborhood. The settlement sheet and other closing documents listed Galaviz as the "buyer," even though Salas contributed more than two-thirds of the purchase funds. For the reasons stated above, Galaviz knew that the $48,304.31 check drew on drug trafficking proceeds. Accordingly, with respect to Count 14, it was reasonable for the jury to conclude that Galaviz laundered Salas's trafficking proceeds in violation, *inter alia*, of 18 U.S.C. § 1957(a).

### 3.    Magana

#### a.    Evidence of Sudden Wealth

IRS Agent Juan Rodriguez testified that, from 2006 through 2008, Magana reported income of approximately $140,000 in total from work as a hair dresser at a salon. She did not file a tax return in 2009. Yet, during that period, Magana received approximately $220,000 in wire transfers and cash deposits into the eleven different bank accounts that she controlled.

This evidence demonstrates that Magana experienced sudden wealth in the form of property valued at more than $10,000.

#### b.    Evidence of Knowledge of Drug Trafficking

Nos. 11-41376 c/w 11-41392

From 2002 to 2009, the record reflects instances where Magana knew that Salas—her brother—was using the alias "Daniel Obregon." Moreover, on April 3, 2007, Galaviz wired $52,130 into Chase Bank Account No. 7697, which Magana controlled. Magana used those funds to purchase a $50,000 CD on April 17, 2007. Subsequently, Magana increased the CD purchase to $80,000, using some of the approximately $74,600 in cash that had been deposited into the account between July 2006 and April 2007. Upon the CD's maturation, Magana wired $25,000 from the account to Becerra in Mexico and another $58,692 back to Galaviz.

Together, this evidence—especially the $25,000 transfer to Becerra, a drug trafficker—could permit a reasonable jury to infer that Magana knew her sudden wealth came or derived from Salas's drug trafficking, an unlawful activity.

### c.     Evidence of an Implicit Agreement to Launder Funds Derived from Salas's Trafficking

In 2007 alone, Magana purchased a new Ford F150 pickup truck for $41,694, a new Jeep Commander SUV for $38,500, and a new Mercedes-Benz SUV for $73,641.95. With respect to each purchase, someone other than Magana made most of the payments and someone other than Magana ultimately drove the vehicle (generally Salas). There was no apparent purpose to Magana making the purchases other than the intentional obscurement of the true purchaser.

In light of Magana's knowledge that she had obtained property in excess of $10,000, and that the property was derived from Salas's unlawful drug trafficking, Magana's intentional use of the property to act as a straw purchaser of the vehicles could permit a reasonable jury to infer that Magana implicitly

Nos. 11-41376 c/w 11-41392

agreed to launder the source of the property in order to facilitate Salas's trafficking.[8]

### d.    Conclusion

Based on the above evidence, it was reasonable for the jury to conclude that Magana conspired to launder Salas's drug trafficking proceeds in violation, *inter alia*, of 18 U.S.C. § 1956(h).

On or about March 29, 2007, Magana drew a $15,000 check on Chase Account No. 7969 in order to make a payment on Salas's house in Laredo. For the reasons stated above, Magana knew the check was funded with Salas's drug trafficking proceeds. Accordingly, it was reasonable for the jury to conclude that Magana laundered those proceeds in violation, *inter alia*, of 18 U.S.C. § 1957(a).

## II.    Identification of Magana at Trial

Magana contends that the prosecution did not sufficiently identify her at trial because no witness for the prosecution personally identified her to the jury. This contention, however, is directly at odds with our longstanding precedent. Identity may be established "by inference and circumstantial evidence." *United States v. Seals*, 987 F.2d 1102, 1110 (5th Cir. 1993) (citations and internal quotation marks omitted). In other words, a witness need not "actually 'point out' the defendant in the courtroom." *Id.*

Here, the prosecution called DEA Agent Royce Clayborne at trial, who testified that Magana's driver's license bore a home address matching the home address listed on Magana's 2007 and 2008 tax returns. The license was

---

[8] To be clear, evidence that simply demonstrates a defendant made purchases above—even grossly above—her means, is not sufficient alone to establish money laundering or conspiracy to commit money laundering. Here, the multiple and unexplained wire transfers, deposits, and contrivances (e.g., purchasing the CD) established Magana's knowledge of sudden wealth from Salas's trafficking. Only within this context was Magana's otherwise inexplicable purchase of numerous expensive vehicles for Salas sufficient to establish her implicit agreement to launder his proceeds in order to facilitate his trafficking.

introduced into evidence, which allowed the jury to compare the picture on it with Magana.  Under *Seals*, this was sufficient to establish Magana's identity.

## III.   Challenges to the Admission or Exclusion of Evidence

### A.     Standard of Review

"Review of a trial court's evidentiary rulings is for abuse of discretion, subject to harmless error review." *United States v. Jackson*, 636 F.3d 687, 692 (5th Cir. 2011) (citation omitted).  "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *United States v. Ragsdale*, 426 F.3d 765, 774 (5th Cir. 2005) (citation and internal quotation marks omitted).

A "trial court is afforded wide discretion in assessing the relevance and prejudicial effect of evidence." *United States v. Seale*, 600 F.3d 473, 494 (5th Cir. 2010) (citation omitted).  Therefore it has the power to exclude, *inter alia*, witness "testimony that would be cumulative and marginally relevant." *See United States v. Wallace*, 32 F.3d 921, 929 (5th Cir. 1994).

"Alleged violations of the Confrontation Clause of the Sixth Amendment during cross-examination are reviewed de novo, applying a harmless error standard." *United States v. El-Mezain*, 664 F.3d 467, 491 (5th Cir. 2011).

### B.     Limitations on Magana's Introduction of Character Evidence

Magana submits that the district court abused its discretion when it limited her introduction of character evidence on the question of whether she is naive and gullible, or unduly influenced by her brother (Salas).

#### 1.     Applicable Law

"Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1).  However, in a criminal case, "a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it." *Id.*

404(a)(2)(A).  When such "evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion.  On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct."  *Id.* 405(a).

### 2.    Analysis

Magana listed a friend and co-worker from the hair salon, Kim Montee, as a character witness.  Montee would have testified that Magana was naive and gullible, or unduly influenced by Salas, and therefore did not know that Salas was a drug trafficker.  The district court rejected the proffered testimony, explaining:  "[T]he fact that [Magana] is or is not naive will not establish whether or not she has knowledge."  The court added that Magana "could be naive and still have done it willfully and knowingly. . . ."  On appeal, Magana argues that Montee's testimony was relevant under Rules 404(a)(2)(A) and 405(A).  She submits that Montee's testimony would have helped to establish a character trait of naivete which, Magana posits, would have undermined the jury's determination that she knew Salas was a drug trafficker.  Thus, Magana contends the district court abused its discretion by not allowing the testimony.

We note at the outset that this argument fails on appeal in light of our broad deference to district court evidentiary determinations.  *See Seale*, 600 F.3d at 494; *Wallace*; 32 F.3d at 929.  That said, Magana presented a naivete defense at closing argument.  It failed to persuade the jury, presumably because of the overwhelming evidence of Magana's guilt.  The incremental testimony of Montee—Magana's conceded friend—would not have changed that outcome (at least not for legally cognizable reasons).  The district court did not abuse its discretion when it limited Magana's introduction of Montee's testimony on the question of whether Magana is naive and gullible, or unduly influenced by Salas.

### C.    Alaniz's *Crawford* Challenge

Nos. 11-41376 c/w 11-41392

Alaniz contends that the district court abused its discretion when it denied his request for *Crawford* jury instructions, and admitted a recorded conversation between Salas and a confidential informant that criminally implicated him. *See Crawford v. Washington*, 541 U.S. 36 (2004).

### 1.     Applicable Law

"Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . . Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 68. "Statements made between co-conspirators in furtherance of a conspiracy are not testimonial." *United States v. King*, 541 F.3d 1143, 1145-46 (5th Cir. 2008) (citation omitted).

### 2.     Analysis

Alaniz argues that the district court abused its discretion by admitting a recorded conversation between Salas and a confidential informant that criminally implicated Alaniz because the court had denied Alaniz's request for accompanying *Crawford* jury instructions. Alaniz contends that the confidential informant on the tape was not CS1 or CS2, but a third confidential informant who did not testify. He also contends that admission of the tape without an accompanying instruction as to the parameters of *Crawford* and its progeny violated the Confrontation Clause of the Sixth Amendment because neither Salas nor the purported third informant testified at trial.

The government responds that it was CS2 on the tape, that he did testify at trial, and that he was subjected to cross-examination. The government also argues that, regardless, the contents of the recordings were non-testimonial statements between co-conspirators in furtherance of their conspiracy and, therefore, fell outside the ambit of the Confrontation Clause's protections.

16

### a. Whether the Confrontation Clause Extends to the Recorded Conversation.

"A defendant is presumed to continue in a conspiracy unless he makes a substantial affirmative showing of withdrawal, abandonment, or defeat of the conspiratorial purpose." *United States v. Torres*, 114 F.3d 520, 525 (5th Cir. 1997). "The defendant has the burden of proving affirmative acts that are inconsistent with the conspiracy and are communicated in a manner reasonably calculated to reach his coconspirators." *Id.* (citation omitted).

Here, unlike the three ML Appellants, Alaniz has not challenged the sufficiency of the evidence underlying his conspiracy conviction. Therefore, he is bound by that conviction on appeal. Furthermore, in his brief, he provides no evidence that he had withdrawn from the conspiracy at the time of the recorded conversation. Accordingly, for purposes of our review, Alaniz was a co-conspirator with Salas and the confidential informant (who was pretending to conspire) with respect to any recorded statements pertaining to the conspiracy.

"Statements made between co-conspirators in furtherance of a conspiracy are not testimonial." *King*, 541 F.3d at 1145-46 (citing *Crawford*, 541 U.S. at 56). From the material discussed on the recordings and Officer Colon's identification of the speakers, the district court reasonably concluded that the statements were made between Salas and a co-conspirator in furtherance of the conspiracy. While the recorded conversation here was not between Salas and Alaniz, or between Alaniz and the informant, all three individuals were common to the conspiracy being discussed. Thus, the Confrontation Clause did not extend to the recorded statements. There was no need for a curative *Crawford* jury instruction, and the district court did not abuse its discretion by admitting the statements without one.

### D. Challenges to the Testimony of CS1 and CS2

Nos. 11-41376 c/w 11-41392

Salas, Alaniz, and Lopez submit that the district court abused its discretion when it imposed limitations on defense counsel's cross-examinations of CS1 (Ramirez) and CS2 (Garcia), and allowed the two informants to testify under aliases without disclosing their dates of birth or social security numbers.

### 1.     Additional Facts

Prior to jury selection, the government shared the "true names" of CS1 and CS2 with defense counsel, as well as other background information including criminal histories, plea agreements, confidential informant agreements, payment schedules, and prior testimonies. Defense counsel then requested CS1 and CS2's dates of birth and social security numbers, ostensibly to facilitate further background investigation for purposes of cross-examination. The district court denied that request. On July 11, 2011, the district court granted the government's requests that CS1 and CS2 be allowed to testify under aliases at trial, and that defense counsel be prohibited from referring to them by their actual names. The two informants proceeded to testify under aliases and were subjected to cross-examination, albeit with the following limitations.

### a.     CS1

At the time of trial, CS1's husband was in jail on unrelated drug trafficking charges. During cross examination, defense counsel asked CS1 how many years her husband was involved in the drug trade and, in a follow-up question, how many years she was aware of it. The prosecution objected to both questions, and the court sustained both objections on the ground that they were improper lines of impeachment. The court noted that defense counsel remained "free to bring up bias or prejudice."

### b.     CS2

CS2 admitted at trial that, like Salas, he previously had worked with the Gulf Cartel and Los Zetas. CS2 acknowledged his prior involvement with cocaine and marijuana trafficking, and other violent crimes including murder.

18

Nos. 11-41376 c/w 11-41392

During cross-examination, defense counsel asked CS2 whether he had reported his past income from the Gulf Cartel to the IRS. The district court rejected the question as irrelevant.

### 2.    Applicable Law

#### a.    The "Informant Privilege" and the "*Roviaro* Limitation" on That Privilege

The "informant privilege" is a privilege held by the government "to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." *Roviaro v. United States*, 353 U.S. 53, 59 (1957) (citations omitted). "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." *Id.*

In *Roviaro*, the confidential informant at issue "was not produced, identified, or otherwise made available" and, thus, did not testify at trial. *Id.* at 55. However, other witnesses for the prosecution testified concerning the informant's role in the investigation. *Id.* During cross-examination of those witnesses, the district court rejected defense counsel's attempts to learn the informant's identity. *Id.* The Supreme Court reversed the defendant's ultimate conviction, explaining: "Where the disclosure of an [informant's] identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60-61 (citations omitted). This "limitation on the applicability of the privilege arises from the fundamental requirements of fairness." *Id.* at 60.

#### b.    "*Roviaro* Balancing" to Determine Whether the Informant Privilege Must Give Way to Disclosure

"[N]o fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information

against the individual's right to prepare his defense." *Roviaro*, 353 U.S. at 62. "Whether a proper balance renders nondisclosure erroneous [depends] on the particular circumstances of each case . . . ." *Id.* The non-exhaustive list of factors taken into consideration includes (i) "the crime charged"; (ii) "the possible defenses"; and (iii) "the possible significance of the [informant's] testimony." *Id.* Professors Mueller and Kirkpatrick have advocated that the optimum forum for this balancing of the public interest is an *in camera* hearing before the trial judge. *See* 2 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 5.63 (3d ed. 2007).

### c. *Smith* and the Use of Confidential Informants As Trial Witnesses

In *Smith v. Illinois*, the Supreme Court expressly distinguished *Roviaro*, and its attendant balancing, as applicable only where the informant did not testify under alias at trial (or did not testify at all). *See* 390 U.S. 129, 133 (1968). The Court explained that a government witness's "name and address open countless avenues of in-court examination and out-of-court investigation. To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself." *Id.* at 131. *Smith*, however, did not mandate a *per se* rule requiring disclosure in open court of any government witness's name and address. Research reveals two cases, unaddressed by the parties, in which courts addressed situations, like this one, in which government witnesses whose true names were provided to the defense were permitted to testify at trial under pseudonyms. *See United States v. Celis*, 608 F.3d 818 (D.C. Cir. 2010); *United States v. Maso*, No. 07-10858, 2007 WL 3121986 (11th Cir. 2007) (per curiam) (unpublished). Those courts concluded that such testimony did not violate the Confrontation Clause, under the balancing framework set forth in *Alford*, *Smith*, and *Roviaro*, because the witnesses had a reasonable fear for their safety, and the non-disclosure of their true identities did not unduly

hamper the defendants' ability to prepare their defenses. *Celis*, 608 F.3d at 832–33; *Maso*, 2007 WL 3121986, at \*4.

### 3.    Analysis

#### a.    CS1 and CS2's Testimony Under Aliases

Here, CS1 and CS2 testified at trial and were subjected to cross-examination. While they testified under aliases, defense counsel were provided with their "true names" and significant background information. The only restrictions were that defense counsel could not use the informants' actual names in open court, and did not have access to the informants' dates of birth and social security numbers.

Balancing the public interest in protecting the flow of information against the defendants' confrontation rights, we conclude that the limited use of pseudonyms did not violate the Confrontation Clause in this case. Defense counsel were provided with the true names of the witnesses, information about their backgrounds, their criminal records, the amount of compensation they received for their DEA cooperation, and trial testimony they gave in previous cases. And the witnesses were not strangers; Salas had known them for years. The only information not disclosed to defense counsel was the witnesses' dates of birth and social security numbers. We fail to see how the non-disclosure of such information, in light of the information provided, "frustrated meaningful investigation into their respective backgrounds." The defendants do not identify what additional background information they sought to uncover. Nor do they provide apposite authority supporting their position that the non-disclosure of a witness's date of birth and social security number violates the Confrontation Clause; indeed, the only authority they cite is a case in which the true name of a pseudonymous government witness was *not* disclosed to the defense, *United States v. Fuentes*, 988 F. Supp. 861 (E.D. Pa. 1997), a different situation than the one presented here. In fact, the situation here is strikingly similar to the

situations in *Celis* and *Maso*: in all three cases, the pseudonymous witnesses were informants for the DEA who feared reprisal from drug trafficking organizations.

The principal difference is that the government here did not offer specific evidence that the witnesses had a legitimate fear of reprisal and the court did not make any findings on this issue. But the defendants did not raise a *Roviaro* objection to the district court, and we are aware of no case holding that a district court has the obligation to consider the Confrontation Clause implications of pseudonymous testimony *sua sponte*. Because the defendants raised a discovery objection, but not a confrontation objection, to the district court's ruling allowing the confidential informants to testify under aliases, our review is for plain error. Under the circumstances, we perceive no plain error.

### b.    Limitations on Defense Counsel's Cross-Examinations of CS1 and CS2

With respect to its limitations on defense counsel's ability (i) to re-question CS1 about her possible involvement in her husband's drug trafficking; and (ii) to question CS2 about his tax reporting practices for past drug trafficking income, the district court did not abuse its discretion. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679. Here, the duplicative question to CS1 was "repetitive" at a minimum. Moreover, the question to CS2 was, at best, "marginally relevant."

"The relevant inquiry is whether the jury had sufficient information to appraise the bias and motives of the witness." *Tansley*, 986 F.2d at 886 (citation omitted). Here, cross-examination provided the jury with ample insight into CS1 and CS2's respective associations and criminal pasts, and possibly self-interested

motivations for cooperating with the government.  The district court, which reminded defense counsel it remained "free to bring up bias or prejudice," did not abuse its discretion by imposing its limitations on cross-examination.

## IV.    Challenges to Jury Instructions

### A.    Standard of Review

"When a challenge to jury instructions is properly preserved for appeal, we review the challenged instructions for abuse of discretion."  *United States v. Newell*, 315 F.3d 510, 528 (5th Cir. 2002) (citation and internal quotation marks omitted).  "In deciding whether the evidence reasonably supports the jury charge, the court reviews the evidence and all reasonable inferences that may be drawn therefrom in the light most favorable to the government."  *Id.* at 529 (citation and internal quotation marks omitted).[9]

### B.    Challenges to the District Court's "Deliberate Ignorance" Instruction

Salas, Lopez, and Galaviz contend the district court abused its discretion when it gave this Circuit's pattern jury instruction concerning "deliberate ignorance" as to the money laundering counts (Counts 10 through 15).

#### 1.    Additional Standard of Review

"Appellate review of a deliberate ignorance instruction is necessarily a fact-intensive endeavor.  To determine the validity of the instruction, this Court must carefully examine the totality of the evidence."  *United States v. Lara-Velasquez*, 919 F.2d 946, 952 (5th Cir. 1990).

"Even if the district court errs in its decision to give the deliberate ignorance instruction, any such error is harmless where substantial evidence of actual knowledge was presented at trial."  *United States v. Miller*, 588 F.3d 897, 906 (5th Cir. 2009) (alteration, citation, and internal quotation marks omitted).

---

[9]  All Appellants raising challenges to jury instructions properly preserved their challenges by objecting contemporaneously.

### 2.    Additional Facts

After a colloquy with the prosecution and the various defense counsel for Salas and the ML Appellants, the district court found a sufficient basis for the "deliberate ignorance" instruction with respect to Salas, Lopez, and Galaviz. Accordingly, the district court gave a "deliberate ignorance" instruction that matched our pattern instruction word-for-word, *see* Fifth Circuit Pattern Jury Instructions (Criminal Cases) §§ 1.37, 1.37A (2012), with the added final sentence that "[t]his instruction does not apply to defendant [Magana]."

### 3.    Applicable Law

"If a deliberate ignorance instruction is given, a 'balancing' instruction should be considered upon [the] request of [the] defendant." *United States v. Vasquez*, 677 F.3d 685, 695-96 (5th Cir. 2012) (per curiam) (citation omitted). That is, a "deliberate ignorance instruction does not lessen the government's burden to show, beyond a reasonable doubt, that the knowledge elements of the crimes have been satisfied." *Id.* at 696 (citations and internal quotation marks omitted). "Although a deliberate ignorance instruction should rarely be given, we have permitted its use to inform the jury that it may consider evidence of the defendant's charade of ignorance as circumstantial proof of guilty knowledge." *United States v. Bieganowski*, 313 F.3d 264, 289 (5th Cir. 2002) (citations and internal quotation marks omitted). "It is only to be given when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference." *Id.* (citation and internal quotation marks omitted).

"[I]n a multiple-defendant case where only some of the defendants justify a deliberate ignorance charge, singling out the defendant who merits the instruction, based, perhaps, on disputed or equivocal evidence, may be unfairly prejudicial to that defendant." *Id.* at 290 (citation and internal quotation marks omitted). "It is equally true, however, that giving the instruction generally, without naming a specific defendant, may prejudice those co-defendants who do

not merit the instruction." *Id.* (citation and internal quotation marks omitted). "Thus, we have indicated that the better approach in this situation is to give the instruction and indicate that it may not apply to all of the defendants." *Id.* (alteration, citation, and internal quotation marks omitted).

### 4.    Analysis

A "deliberate ignorance" instruction is proper when the evidence shows (i) "subjective awareness of a high probability of the existence of illegal conduct"; and (ii) "purposeful contrivance to avoid learning of the illegal conduct." *Bieganowski*, 313 F.3d at 289 (citation and internal quotation marks omitted). "The essential feature of deliberate ignorance is the conscious action of the defendant—the defendant consciously attempted to escape confirmation of conditions or events he strongly suspected to exist." *Vasquez*, 677 F.3d at 697 (citations, emphasis, and internal quotation marks omitted).

Here, Lopez commented to CS1 that Salas's LC Contractors was not in business "to make money." Also, in 2008 and 2009, Lopez's Via Italia business received significantly more funds from cash deposits and loans than from sales. Additionally, both Lopez and Galaviz controlled bank accounts for which they did not receive monthly statements, as well as accounts that received large cash deposits and wire transfers from drug traffickers in Mexico. Moreover, Lopez controlled bank accounts from which she regularly allowed others to sign checks that drew on those accounts. Finally, Lopez and Galaviz made multiple false statements on loan, sale, or other official documents. For example, they referred to Salas (their immediate relative) as "Daniel Obregon." Salas, Lopez, and Galaviz initiated or participated in large transfers of money across 38 bank accounts that they controlled, and engaged in a host of transactions for which they did not have sufficient legitimate finances to have conducted. For example, they deposited many times more money into the various bank accounts than they had earned from legitimate occupations.

Nos. 11-41376 c/w 11-41392

On appellate review in these circumstances, this Court considers "the totality of the evidence." *Lara-Velasquez*, 919 F.2d at 952. In light of the above evidence, the district court did not abuse its discretion by determining that there had been "a high probability of the existence of illegal conduct," and that Lopez and Galaviz had "consciously attempted to escape confirmation" of it. *See Vasquez*, 677 F.3d at 697 (citations omitted); *Bieganowski*, 313 F.3d at 289 (citation omitted).[10]

## C.    Challenges to the District Court's *Pinkerton* Instruction

Alaniz and the ML Appellants submit that the district court abused its discretion in the manner in which it gave this Circuit's pattern jury instruction concerning "*Pinkerton* liability" as to Counts 3 through 4, 6 through 9, and 11 through 15. *See Pinkerton v. United States*, 328 U.S. 640, 645-48 (1946).

### 1.    Additional Standard of Review

"We review claimed deficiencies in a jury charge by looking to the entire charge as well as the arguments made to the jury." *United States v. Chagra*, 807 F.2d 398, 402 (5th Cir. 1986). "Our inquiry is whether in the context of the true trial scene the jury was given incorrect instructions." *Id.* "This is a common sense approach that recognizes that the jury charge does not stand alone for separate examination; that the charge is part of a larger picture of what the jury was told." *Id.* "Examined apart from context, charges frequently have seemingly ambiguous expressions and understandably so, given the need of trial courts to assemble the divergent requests of counsel into a meaningful whole." *Id.*

---

[10] To the extent that the district court did err by giving the "deliberate ignorance" instruction—perhaps with respect to Salas who almost certainly had "actual knowledge"—the error was harmless because the evidence was sufficient to support a finding of either "deliberate ignorance" or "actual knowledge" with respect to Salas and all three ML Appellants (including Magana). *Miller*, 588 F.3d at 906 (citation omitted); *see also United States v. Demmitt*, 706 F.3d 665, 677 n.1 (5th Cir. 2013) ("Even if both prongs of the test were not satisfied and the district court erred in giving the deliberate ignorance instruction, we hold the error harmless because there was substantial evidence that Demmitt was aware of the scheme." (citation omitted)).

Nos. 11-41376 c/w 11-41392

### 2.    Additional Facts

Here, the jury instruction given matched our pattern instruction word-for-word.  *See* Fifth Circuit Pattern Jury Instructions (Criminal Cases) § 2.22 (2012). Alaniz, however, argues that the instruction was not clear that, while he was charged with his co-conspirators' substantive drug trafficking conduct, he was not charged with conduct arising out of the separate money laundering conspiracy (even though Salas was common to both).  The ML Appellants make the same argument with respect to their charge encompassing substantive money laundering conduct but not the separate drug trafficking conspiracy.  The crux of these arguments is that the district court did not pay sufficient heed to our language in *United States v. Armstrong* that "*Pinkerton* liability attaches only to substantive crimes, not to other conspiracies."  *See* 619 F.3d 380, 387 (5th Cir. 2010).

### 3.    Applicable Law

"[A] substantive conviction cannot be upheld solely under *Pinkerton* unless the jury was given a *Pinkerton* instruction."  *United States v. Polk*, 56 F.3d 613, 619 n.4 (5th Cir. 1995) (citations omitted).  In this Circuit, the pattern *Pinkerton* instruction is read in the disjunctive, allowing for liability "if the offense was committed in furtherance of, <u>or</u> as a foreseeable consequence of, the conspiracy[.]" *See* Fifth Circuit Pattern Jury Instructions (Criminal Cases) § 2.22 (2012) (emphasis added).  *Armstrong*, 619 F.3d at 387 (citations omitted); *but see United States v. Gonzalez*, 570 F.3d 16, 26 n.8 (1st Cir. 2009) (citations omitted) (reading the First Circuit's comparable instruction in the conjunctive).

### 4.    Analysis

Alaniz and the ML Appellants argue that the district court did not sufficiently distinguish between the drug trafficking conspiracy (Count 1) and the money laundering conspiracy (Count 10), and the substantive counts respectively relating to each (drug trafficking:   Counts 3-4, 6-9;  money

27

laundering: Counts 11-15). Because they raise this objection for the first time on appeal, review is for plain error.

The district court distinguished between the substantive drug trafficking charges, which it called "the possession counts" and specifically linked to "the conspiracy charged in Count 1"; and the money laundering charges, which it called "the transactional counts" and specifically linked to "the conspiracy charged in Count 10." In light of the unavoidable ambiguity in a jury charge involving multiple defendants and multiple instances of alleged conduct, and the "common sense approach" to examining a jury charge that this Court has adopted, *see Chagra*, 807 F.2d at 402, we perceive no error, plain or otherwise.

**D.     Challenges to the District Court's Decision Not to Eliminate Count 10's "in Order to Avoid a Reporting Requirement"**

Lopez and Magana maintain that the district court abused its discretion when it declined to amend its jury instructions to eliminate Count 10's "in order to avoid a reporting requirement" in the specific charges against them.

### 1.     Additional Standard of Review

The applicable standard for reviewing a properly preserved challenge to the district court's jury instructions, including those not given, is set forth *supra* under Part IV.A. We presume that a jury follows the instructions given by the district court. *See United States v. Ebron*, 683 F.3d 105, 132 (5th Cir. 2012) (citation omitted).

### 2.     Additional Facts

Count 10 charged Salas and the ML Appellants with: (i) the concealment of drug trafficking proceeds; (ii) in order to avoid a reporting requirement; (iii) by moving funds outside the United States and engaging in monetary transactions of a value greater than $10,000 through a financial institution.

At closing argument, the prosecutor stated the following:

> You can convict every one of these four defendants on a different theory of money laundering.  For example, the only person who is really involved with the avoidance of currency transaction reports is going to be [Salas]. . . .  He would be the one that you could convict beyond a reasonable doubt for conspiracy to engage in money laundering for the purpose of avoiding a monetary currency transaction report.

Lopez and Magana contemporaneously objected that the prosecutor's statement at closing argument had amounted to abandonment of the "in order to avoid a reporting requirement" as to all Appellants except Salas, and that the applicable jury instructions required amendment to reflect the abandonment.

### 3.     Analysis

This challenge is unavailing.  Here, the district court already had instructed the jury (i) to base its verdict "solely upon the evidence"; (ii) to "consider only the evidence presented during the trial"; and (iii) to "[r]emember that any statements . . . made by the lawyers are not evidence" and "not binding."  The jury is presumed to have followed those instructions.  *See Ebron*, 683 F.3d at 132 (citation omitted).  The district court rightly rejected Lopez and Magana's objection because the jury is presumed to have understood that the prosecutor's statement was merely her assessment of the evidence, rather than evidence in and of itself.  Accordingly, the district court did not abuse its discretion when it declined to amend its jury instructions.

## V.     Challenges to Various Statements Made by the Prosecutor

### A.     Standard of Review

Where a defendant had objected to allegedly improper statements made by a prosecutor, and the district court admitted the challenged statements over the defendant's objection, we review the admission of those statements for abuse of discretion.  *United States v. Gracia*, 522 F.3d 597, 600 n.2 (5th Cir. 2008) (citations omitted).  In doing so, "we must first decide whether the prosecutor

made an improper remark" and, "if an improper remark was made, we must determine whether the remark affected the substantial rights of the defendant." *Id.* (citations omitted). To determine whether a remark prejudiced the defendant's substantial rights, we assess "the magnitude of the statement's prejudice," "the effect of any cautionary instructions given," and "the strength of the evidence of the defendant's guilt." *United States v. Gallardo-Trapero*, 185 F.3d 307, 320 (5th Cir. 1999) (citations and internal quotation marks omitted).

Where the defendant had made no contemporaneous objection to the challenged statements, we review only for plain error. *Gracia*, 522 F.3d at 600 n.2 (citations omitted). To demonstrate plain error, the defendant must show that there was error, it was plain, and it affected his or her substantial rights. *Id.* at 600 (citations omitted). Even if the defendant can meet this burden, "we still would have discretion to decide whether to reverse, which we generally will not do unless the plain error seriously affected the fairness, integrity, or public reputation of the judicial proceeding." *Id.* (citations omitted).

## B.    Analysis

All five Appellants argue that various statements made by the prosecutor amounted to misconduct. These arguments can be grouped into four overarching challenges. We address them in turn.[11]

### 1.    Challenge I

The prosecutor said the following during closing argument:

> Rather than address the evidence . . . [Salas would] rather say, well, they should have done this. They should have gotten DNA off the bundles. They should have gotten hair fibers. Does he think the bundles of marijuana were raked? I mean, these agents who testified in this case . . .

---

[11] Because Salas personally raised all four of these challenges, while each remaining Appellant raised only some of the challenges, we focus on the specific challenges raised by Salas. All challenges raised by the other Appellants fail for the same reasons that Salas's do.

Nos. 11-41376 c/w 11-41392

> are agents who have many, many years of experience
> handling these kinds of cases.  They know what to do.

(emphasis added).  Salas objected, and the district court sustained.  Presently, Salas contends that the district court mishandled his objection by not declaring a mistrial.  He had not contemporaneously requested one.

When a defendant asks this Court to reverse his conviction under such circumstances, he essentially asks us "to go against the implicit judgment of both the trial court and [his] trial counsel that the trial court's corrective action was adequate and appropriate." *See United States v. Salinas*, 480 F.3d 750, 756 (5th Cir. 2007) (citations and internal quotation marks omitted).  Our review of the district court's decision not to declare a mistrial is for plain error only.  *Id.* (citation omitted).

"[A] prosecutor's closing argument cannot roam beyond the evidence presented during trial:  Except to the extent the prosecutor bases any opinion on the evidence in the case, he may not express his personal opinion on the merits of the case or the credibility of witnesses." *Gallardo-Trapero*, 185 F.3d at 320 (alteration, citation, and internal quotation marks omitted).  Nonetheless, for "improper comment or questioning to represent reversible error, it generally must be so pronounced and persistent that it permeates the entire atmosphere of the trial." *United States v. Castillo*, 77 F.3d 1480, 1497 (5th Cir. 1996) (citation and internal quotation marks omitted).

Here, the prosecutor's statement amounted to minor bolstering, which the district court rightly struck.  Therefore, even if the statement were improper under *Gallardo-Trapero*, it certainly was not "so pronounced and so persistent that it permeate[d] the entire atmosphere of the trial."

### 2.    Challenge II

The following is an additional statement that the prosecutor made during closing argument:

31

> [I]n every single one of those recordings, ladies and
> gentlemen, [Salas] implicates himself as being a member
> of the conspiracy as having not only possessed the cocaine
> that was seized with him.  We proved it was cocaine, yes.
> We have to prove it was cocaine.  That's why we brought
> chemist after chemist after chemist to testify that the
> substance that was seized. . . .

(emphasis added).  The district court halted this statement *sua sponte*, without
Salas's trial counsel proffering an objection.  Thus, we review Salas's present
challenge for plain error.  *Gracia*, 522 F.3d at 600 n.2.

Salas's challenge cannot withstand review.  First, Salas cannot show that
the "chemist after chemist after chemist" statement triggered plain error
because the prosecution had called four forensic chemists from the DEA to
testify.  If anything, the prosecutor understated in her summation of the
evidence.  Moreover, the district court halted the statement *sua sponte*.  Thus,
the only plain error would have been not declaring a mistrial, which Salas's trial
counsel did not request and which would have been unwarranted regardless.
Second, even if repetition of the word "chemist" could be interpreted as
bolstering, it did not come close to "seriously affect[ing] the fairness, integrity,
or public reputation" of the trial.  *Gracia*, 522 F.3d at 600 n.2 (citations omitted).

### 3.    Challenge III

The following is a third statement that the prosecutor made during the
rebuttal phase of closing argument, this time pertaining to CS2:

> Ladies and gentlemen, confidential informants, yes, they
> get paid. This isn't Crime Stoppers, an anonymous tip and
> you collect a little something.  This is more involved.  You
> heard [CS2,] as a result of his involvement in another
> investigation, he and his entire family had to be relocated
> for his safety and security.  This isn't easy coming in here.
> . . .

(emphasis added). Salas did not contemporaneously object. Presently, Salas pursues two challenges on appeal concerning this statement. We review his challenges for plain error. *Gracia*, 522 F.3d at 600 n.2.

Salas first contends that the prosecutor's statement amounted to improper bolstering. To determine "whether a prosecutor's comment was improper, it is necessary to look at the comment in context." *United States v. Insaulgarat*, 378 F.3d 456, 461 (5th Cir. 2004) (citation omitted). Here, two other statements at trial preceded the prosecutor's statement during closing rebuttal. On direct examination, CS2 testified to exactly what the prosecutor later summarized during closing argument: that due to his involvement as a DEA informant in an unrelated investigation, the government had needed to relocate him and his family for their safety and security. Salas did not contemporaneously object to that testimony either. Subsequently, during his closing argument, Salas's trial counsel implied that CS2's prior testimony had been colored by the approximately $300,000 that CS2 had earned over his approximately six and one-half years as a DEA informant.

In context, we conclude that it was reasonable for the prosecutor to rebut defense counsel's closing argument by summarizing CS2's earlier testimony with the statement that it "isn't easy coming in here." After all, a prosecutor may "present what amounts to be a bolstering argument if it is specifically done in rebuttal to assertions made by defense counsel in order to remove any stigma cast upon [her] witnesses." *United States v. Munoz*, 150 F.3d 401, 415 (5th Cir. 1998) (citation and internal quotation marks omitted). Moreover, in making her rebuttal argument, the prosecutor "may argue fair inferences from the evidence that a witness has no motive to lie." *Gracia*, 522 F.3d at 601 (citation omitted). We therefore reject Salas's first contention.

Salas also contends that the prosecutor's statement amounted to an impermissible appeal to passion or prejudice. *See United States v. Crooks*, 83

F.3d 103, 107 n.15 (5th Cir. 1996) (citations omitted) ("Counsel is not permitted to make an appeal to passion or prejudice calculated to inflame the jury."). This contention cannot stand. Here, rather than appealing to passion or prejudice, the prosecutor simply was stating the obvious—that Laredo (where the jurors themselves lived) is an epicenter of drug violence. Especially within the context of cleansing the stigma upon CS2 cast by Salas's counsel, the prosecutor's statement was permissible. At a minimum, the district court's failure to strike it *sua sponte* was not plain error. We therefore reject Salas's second contention.

### 4.    Challenge IV

Finally, the prosecutor stated the following during the opening phase of closing argument: "The defense is going to get up here. They're going to attack me. They're going to attack the agents. They're going to attack the confidential sources. And they're going to attack the cooperating defendants, ladies and gentlemen. . . ." No defendant contemporaneously objected to this statement. We review any challenges to it for plain error only. *Gracia*, 522 F.3d at 600 n.2.

Salas and the other Appellants presently contend that the prosecutor's statement amounted to an improper attack on the integrity of the various defense counsel. The government makes the argument that the prosecutor anticipated attacks by defense counsel and, therefore, acted preemptively. We need not decide whether the statement was improper because, under our precedent, the statement—even if improper—would not have caused the defendants substantial prejudice.

In *Gallardo-Trapero*, we were confronted with a prosecutor's improper attempt "to bolster [her] credibility . . . and that of the DEA agents who testified by invoking the authority of the United States and cloaking [her argument and the agents' testimony] in the mantle of the federal government." 185 F.3d at 319. Specifically, the prosecutor had stated: "I repeat, do you think that agents for the federal government and a prosecutor for the federal government, for the

United States of America, are going to . . . get on the witness stand and commit perjury and risk their career[s]. It's not going to happen, ladies and gentlemen." *Id.*; *see also id.* n.5 (providing a larger excerpt from the trial transcript).

We found the prosecutor's remarks to have been improper, explaining that "'it is particularly improper, indeed, pernicious, for a prosecutor to seek to invoke [her] personal status as the government's attorney or the sanction of the government itself as a basis for convicting a criminal defendant.'" *See id.* at 319-20 & n.6 (alteration added) (quoting *United States v. Goff*, 847 F.2d 149 (5th Cir. 1988) (citation omitted)). Nonetheless, we concluded that the prosecutor's remarks had not prejudiced the defendants' substantial rights. *See id.* at 321.

Here, unlike in *Gallardo-Trapero*, Salas and the other Appellants had made no contemporaneous objection to the prosecutor's remarks. Also, counsel has pointed to no on-point authority dictating that the remarks were improper. This is rightly so since chiding the zealousness of defense counsel's presentation, even if improper, is a sin of lesser magnitude than suggesting that a witness for the prosecution be believed simply because he or she is a federal agent. In contrast to the circumstances in *Gallardo-Trapero*, where there was not reversible prejudice, this is an easier case. We therefore reject this challenge.

## VI. Sentencing Challenges

### A. Standard of Review

A challenge to alleged sentencing errors is properly preserved if raised below. *See United States v. Villegas*, 404 F.3d 355, 358 (5th Cir. 2005) (per curiam) (citations omitted). If not properly preserved, we review only for plain error. *Id.* (citations omitted). If properly preserved, we review for abuse of discretion. *See Gall v. United States*, 552 U.S. 38, 51 (2007).

"We apply the clearly erroneous standard of review to the district court's factual determination regarding the quantity of drugs used to establish the base offense level. A factual finding is not clearly erroneous if it is plausible in light

of the record as a whole." *United States v. Johnston*, 127 F.3d 380, 403 (5th Cir. 1997) (citation omitted). "Ultimately, the district court need only determine its factual findings at sentencing by a preponderance of the relevant and sufficiently reliable evidence." *United States v. Betancourt*, 422 F.3d 240, 247 (5th Cir. 2005) (citations and internal quotation marks omitted).

"Generally, a PSR bears sufficient indicia of reliability to permit the sentencing court to rely on it at sentencing. . . .  [I]n the absence of rebuttal evidence, the sentencing court may properly rely on the PSR and adopt it." *United States v. Ollison*, 555 F.3d 152, 164 (5th Cir. 2009) (citations omitted). "The defendant bears the burden of showing that the information in the PSR relied on by the district court is materially untrue." *United States v. Valencia*, 44 F.3d 269, 274 (5th Cir. 1995) (citation omitted).  "Mere objections do not suffice as competent rebuttal evidence." *United States v. Parker*, 133 F.3d 322, 329 (citation omitted).

### B.   Challenges to the Statutory Maximum Sentence Used by the District Court for Count 10

#### 1.   Additional Facts

Count 10 charged Salas and the ML Appellants with a conspiracy in violation of 18 U.S.C. § 1956(h), the object of which was a violation of 18 U.S.C. § 1957 and various violations of 18 U.S.C. § 1956(a).  Count 10 was submitted to the jury without any special interrogatories asking the jury to specify which of the provisions each defendant had conspired to violate.  Thus, it is unclear whether the four convictions were for conspiracies to violate § 1957 or for conspiracies to violate one of the provisions of § 1956(a).

Upon the four defendants' convictions, the district court credited the penalties prescribed by § 1956(a), as referenced by § 1956(h), in setting the defendants' maximum sentences at 20 years each.  The problem is that, while §

1956(a) prescribes a maximum penalty of 20 years for its violation, § 1957 prescribes a maximum penalty of only 10 years.

Salas received the full 20 years imprisonment.  The three ML Appellants each received 11 years, 3 months imprisonment.  On appeal, the ML Appellants argue that it is unclear under which statute—§ 1957 or § 1956(a)—the jury convicted them.  Thus, they argue that their Count 10 sentences should not exceed § 1957's lower, 10-year, maximum.[12]

### 2.    Analysis

"[W]here a jury verdict is ambiguous, a sentence imposed for a conviction on a count charging violations of multiple statutes or provisions . . . may not exceed the lowest of the potentially applicable maximums . . . ." *United States v. Conley*, 349 F.3d 837, 840 (5th Cir. 2003) (citation and footnote omitted).  Here, the government rightly concedes that *Conley* is controlling, and that the sentences of Salas and the ML Appellants should therefore be vacated.  We thus vacate those Appellants' sentences—as to Count 10 only—and remand for re-sentencing.

### C.    Appellants' More General Challenges to Their Sentences

Aside from their challenges to the statutory maximum sentence used for Count 10, Salas and the ML Appellants also raise more general challenges to their respective sentences.  We address them in turn.

### 1.    Salas

Salas's raises two issues.  The first is whether the district court erred by attributing the entire $1,913,937—which was deposited into the 38 bank

---

[12] Salas, by contrast, does not challenge his Count 10 sentence.  Presumably, Salas does not pursue a challenge because, even if successful, it would have no bearing in light, *inter alia*, of his concurrent life sentences for Counts 1, 3, 4, 6, and 9.  Nevertheless, as discussed below, the government concedes that Salas's sentence—as well as the ML Appellants' sentences—should be vacated for re-sentencing in light of controlling authority.  We agree and, accordingly, vacate Salas's unchallenged Count 10 sentence as plain error.

accounts controlled by Salas and the ML Appellants—to drug trafficking, and then converting the $1,913,937 into marijuana-equivalent for purposes of applying the Sentencing Guidelines. The second is whether the court erred by adopting the recommendation of the probation officer ("PO") that Salas receive a 4-level leader/organizer enhancement pursuant to U.S.S.G. § 3B1.1(a).[13]

### a.    Additional Facts

Pursuant to U.S.S.G. § 3D1.2, the PO grouped the various counts on which Salas was convicted. She then applied the Sentencing Guidelines using Count 10 because it resulted in the highest base offense level.[14] In Salas's pre-sentence report ("PSR"), the PO held him liable for all of the activities of both the drug trafficking and the money laundering conspiracies. Thus, the PO held Salas accountable for all cocaine and marijuana actually seized, as well as for any historical loads (trafficked in the past).

In order to combine the cocaine and marijuana offenses for sentencing purposes, the PO converted all seized cocaine to marijuana-equivalent using the Drug Equivalency Table provided in U.S.S.G. § 2D1.1, Application Note 10(E). The PO then derived a combined (cocaine and marijuana) offense pertaining to 28,978 kg. of marijuana-equivalent.

Salas and the ML Appellants controlled 38 bank accounts into which $1,913,937 was deposited between 2002 and 2009. The PO attributed the entire $1,913,937 to drug trafficking. In accordance with the instructions provided in U.S.S.G. § 2D1.1, Application Note 12, she assumed that they had received $280 in revenue per lb. of marijuana trafficked.[15] The PO divided the $1,913,937 by

---

[13] The PO applied the 2010 edition of the Federal Sentencing Guidelines Manual.

[14] The PO similarly grouped the counts of conviction, and applied the Sentencing Guidelines using Count 10, for Lopez, Galaviz, and Magana.

[15] The PO explained that Salas generally had sold marijuana for $280 to $300 per lb.

Nos. 11-41376 c/w 11-41392

$280 to derive an offense pertaining to 6835.5 lbs. of marijuana-equivalent. She then restated the derived offense as pertaining to its metric equivalent: 3100.5 kg. of marijuana-equivalent. Adding the 3100.5 kg of marijuana-equivalent from historical loads to the 28,978 kg. of marijuana-equivalent from drugs actually seized, the PO calculated an aggregate base offense pertaining to 32,078.5 kg. of marijuana-equivalent. Using the Drug Quantity Table provided in U.S.S.G. § 2D1.1(c)(1), the PO identified a Base Offense Level of 38.

In light, *inter alia*, of the trial testimony of cooperating witness Heriberto Benavides, the PO later added 107,000 kg. of previously uncounted marijuana-equivalent (300 kg. of cocaine) to Salas's base offense, for an amended aggregate base offense pertaining to 139,078.5 kg. of marijuana-equivalent. Since 38 was the maximum Base Offense Level, and Salas already had been responsible for more than the 30,000 kg. threshold of that Base Offense Level, the amended aggregate had no meaningful effect with respect to the Drug Quantity Table.

The PO recommended a 2-level enhancement for conviction under 18 U.S.C. § 1956(a). She recommended another 2-level enhancement for "sophisticated" money laundering. She also recommended a 4-level enhancement for leading/organizing. The PO declined to recommend a reduction for acceptance of responsibility. Thus, the PO recommended a Total Offense Level of 43.[16] Since Salas had zero prior convictions, he had zero criminal history points and, therefore, a Criminal History Category of I.[17] Accordingly, Salas's Guidelines range was "life."

---

[16] The PO noted that 43 is the maximum Total Offense Level and, therefore, proceeded to treat Salas's Total Offense Level as 43 even though it actually amounted to 46 post-adjustments.

[17] All four Appellants raising Sentencing Guidelines challenges had a Criminal History Category of I.

Nos. 11-41376 c/w 11-41392

At the sentencing hearing, the district court adopted the PSR (as amended) in full, including the 107,000 kg. of added marijuana-equivalent, as well as the three upward adjustments and the one downward adjustment. Salas chose not to speak in his own defense. After the district court asked Salas's trial counsel for a proposed sentence under the factors enumerated in 18 U.S.C. § 3553(a), counsel requested that the sentence not exceed 25 years. The district court stated that it had considered the § 3553(a) factors, and had concluded that Salas's conduct warranted "very stiff . . . statutory penalties."

### b. Analysis

#### i. Whether the district court erred by attributing the entire $1,913,937 to drug trafficking, and by converting it into marijuana-equivalent.

On appeal, Salas argues that the district court erred by adopting the PSR—in which the PO had attributed the entire $1,913,937 to historical drug loads, and had converted it into 3100.5 kg. of marijuana-equivalent. Specifically, Salas contends that it is improper to derive historical drug loads in this manner when there were actual drugs seized.

This argument is flawed. After all, Salas does not challenge the amendment to the PSR based on Benavides's testimony, in which the PO added the 107,000 kg. of previously uncounted marijuana-equivalent. The district court adopted the PSR in full, including the amendment. Because the 107,000 kg. of marijuana-equivalent alone were sufficient to surpass the 30,000 kg. threshold for the maximum Base Offense Level of 38, whether or not the derived 3100.5 kg. of historical loads were included in the aggregate base offense is inconsequential. Thus, without deciding whether the district court erred when it attributed the entire $1,913,937 to drug trafficking, and when it converted the $1,913,937 into marijuana-equivalent for purposes of applying the Sentencing Guidelines, any error was harmless.

### ii. Whether the district court erred by adopting the 4-level sentencing enhancement for leading or organizing the money laundering conspiracy.

"If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase [the offense level] by 4 levels." U.S.S.G. § 3B1.1(a) (2010) (emphasis omitted). A "participant" is a person who "participate[d] knowingly in some part of the criminal enterprise." *United States v. Glinsey*, 209 F.3d 386, 396 (5th Cir. 2000) (citation omitted).

"In distinguishing a leadership and organizational role from one of mere management or supervision, titles . . . are not controlling." U.S.S.G. § 3B1.1, cmt. n.4 (2010). Instead, the sentencing court should consider (i) "the exercise of decision making authority"; (ii) "the nature of participation in the commission of the offense"; (iii) "the recruitment of accomplices"; (iv) "the claimed right to a larger share of the fruits of the crime"; (v) "the degree of participation in planning or organizing the offense"; (vi) "the nature and scope of the illegal activity"; and (vii) "the degree of control and authority exercised over others." *Id.*

Here, the district court adopted the PSR in full. In the PSR, the PO had observed that Salas, at a minimum, had conspired with the ML Appellants—as well as Omar Compean, Javier Hugo Perez, and Miguel Davalos—in the money laundering offenses.[18] Thus, the money laundering conspiracy involved "five or more participants." The PO also had observed that the conspiracy involved 38 different bank accounts and the movement of $1,913,937 in drug trafficking proceeds. Thus, the conspiracy was "otherwise extensive."

---

[18] Compean, Perez, and Davalos apparently were additional targets of the joint DEA/IRS "Operation Reload." They are not party to this appeal.

"The district court's determination that a defendant was a leader or organizer under subsection 3B1.1(a) is a factual finding that this court reviews for clear error." *United States v. Cabrera*, 288 F.3d 163, 173 (5th Cir. 2002) (per curiam) (citation omitted). A factual finding on a sentencing factor is not clearly erroneous so "long as it is plausible in light of the record read as a whole." *United States v. Morris*, 46 F.3d 410, 419 (5th Cir. 1995) (citation omitted).

Here, regarding the seven factors from § 3B1.1, Salas, *inter alia*, had (i) recruited his wife, mother, and sister into the conspiracy; (ii) exercised authority and control over Compean, Perez, and Davalos; and (iii) disproportionately enjoyed the fruits of the conspiracy by purchasing luxury vehicles and real estate (through his co-conspirators). In light of the considerable evidence discussed throughout this opinion, and "the record read as a whole," the district court's determination that Salas was an organizer or leader was not clearly erroneous. Accordingly, the district court did not err by adopting the PO's recommendation that Salas receive the 4-level leader/organizer enhancement.

For the above-stated reasons, we wholly affirm Salas's sentence, other than as discussed *supra* in Part VI.B with respect to the statutory maximum sentence used for Count 10.

### 2.     The ML Appellants

We proceed to the sentencing challenges raised by the three ML Appellants. First, all three Appellants challenge the district court's decision to hold them liable for the entire $1,913,937 laundered, as opposed to just the amounts that each had personally laundered. Second, all three Appellants challenge the district court's adoption of a 2-level sentencing enhancement for "sophisticated laundering" pursuant to U.S.S.G. § 2S1.1(b)(3). Third, Lopez and Magana challenge the district court's denial of a 2-level sentencing reduction under U.S.S.G. § 3B1.2(b) for being a "minor participant" in the money laundering conspiracy. Fourth, Lopez challenges the district court's denial of her

request for a downward departure under the "family ties and responsibilities" policy statement contained in U.S.S.G. § 5H1.6. Fifth and finally, all three Appellants argue that the district court insufficiently considered the 18 U.S.C. § 3553(a) sentencing factors.

### a.    Additional Facts

Count 10 charged each ML Appellant, *inter alia*, with a conspiracy in violation of 18 U.S.C. § 1956(h) involving the full $1,913,937 in laundered funds. The Sentencing Guideline applicable to § 1956(h) is U.S.S.G. § 2S1.1(a)(2) which, in turn, references U.S.S.G. § 2B1.1(b)(1). Applying these two Guidelines to each Appellant's § 1956(h) conviction for an offense involving more than $1,000,000 but less than $2,500,000, the PO identified a Base Offense Level of 24.

For each Appellant, the PO recommended a 6-level enhancement because the Appellant knew, or should have known, that the laundered funds were drug trafficking proceeds. The PO recommended a 2-level enhancement for conviction under 18 U.S.C. § 1956(a), *see* U.S.S.G. § 2S1.1(b)(2) (2010), and another 2-level enhancement for laundering that involved "sophisticated" means. She declined to recommend a reduction for acceptance of responsibility. Thus, for each Appellant, the PO recommended a Total Offense Level of 34.

At the sentencing hearing, Lopez and Magana each asserted entitlement to a 2-level reduction for being a "minor participant" in the money laundering conspiracy. Lopez also requested a downward departure in light of U.S.S.G. § 5H1.6's "family ties and responsibilities" policy statement. She represented that her children would be left parentless for an extended period of time were both she and Salas given lengthy sentences. Lopez stressed that her son has special needs, which cannot be properly attended to in her absence.

The district court adopted each Appellant's PSR in full, with one limited exception. As discussed *supra* in Part VI.B, there were no special interrogatories specifying whether the jury convicted the Count 10 defendants for the

substantive 18 U.S.C. § 1956(a) offenses or for the 18 U.S.C. § 1957 offense. Recognizing this infirmity in the context of U.S.S.G. § 2S1.1(b)(2)'s sentencing enhancement, the court adopted the lower 1-level enhancement from § 2S1.1(b)(2)(A) (for violation of § 1957) rather than the higher 2-level enhancement from § 2S1.1(b)(2)(B) (for violation of § 1956(a)). Accordingly, the court adopted a Total Offense Level of 33. Each Appellant's Guidelines range was "135-168" months.

### b.    Analysis

#### i.    The District Court's Decision to Hold Each ML Appellant Liable for the Entire $1,913,937 Laundered, As Opposed to Just the Amounts That Each Had Personally Laundered

"The court need only make a reasonable estimate of the loss" (in other words, "the amount laundered"). U.S.S.G. § 2B1.1, cmt. n.3(C) (2010) (citation omitted). "The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." *Id.* (citation omitted). In calculating the Base Offense Level, "the sentencing judge holds the defendant accountable for losses due to the defendant's own conduct as well as for those due to the defendant's 'relevant conduct.'" *United States v. Hammond*, 201 F.3d 346, 351 (5th Cir. 1999) (per curiam) (citing U.S.S.G. § 1B1.3 (2010)). "A defendant's relevant conduct includes 'all reasonably foreseeable acts and omissions of others in furtherance of jointly undertaken criminal activity.'" *Id.* (quoting U.S.S.G. § 1B1.3(a)(1)(B) (2010)).

"The Government [is] only required to prove the loss amount by a preponderance of the evidence." *Ollison*, 555 F.3d at 164 (citation omitted). If the loss amount "is difficult or impracticable to determine, the value of the laundered funds . . . is the total amount of the commingled funds." U.S.S.G. §

2S1.1, cmt. n.3(B); *see also United States v. Jamieson*, 427 F.3d 394, 404 (6th Cir. 2005) (citation omitted).   The burden lies with the defendant to "provide[] sufficient information to determine the amount of criminally derived funds without unduly complicating or prolonging the sentencing process." *Id.*

• **Lopez**

Here, Lopez contends (i) that at least some of the $1,913,937 was legitimately derived income; (ii) that she had not been aware of Salas's drug trafficking; and (iii) that Via Italia was a legitimate business.  The district court rejected all three contentions.

With respect to Lopez's first contention, the district court found that Lopez had not provided sufficient information or records to determine whether any of the $1,913,937 was legitimate and, therefore, presumed that all of it was illegitimate under Note 3(B) of the Commentary to U.S.S.G. § 2S1.1.  Regarding Lopez's second contention, the court found that it had been "reasonably foreseeable" to Lopez that at least some of the $1,913,937 was drug trafficking proceeds, which Lopez was then laundering through the 38 different bank accounts controlled by Salas and the other ML Appellants.  Finally, concerning Lopez's third contention, the court found that if Via Italia had indeed been a legitimate business, then Lopez would not have used one of its bank accounts to purchase the $35,000 CD that she then used as collateral for a loan.  Also, Via Italia's bank accounts would not have received $24,000 in checks from Salas, or two cross-border wire transfers from Becerra.

In light of the "appropriate deference" to the district court articulated in Note 3(C) of the Commentary to U.S.S.G. § 2B1.1, we conclude that the court did not err by holding Lopez liable for the entire $1,913,937.  After all, this opinion is replete with evidence that the drug trafficking and money laundering activities were "reasonably foreseeable," and that Via Italia was a sham entity. As for Lopez's claim that at least some of the $1,913,937 was legitimate, it

Nos. 11-41376 c/w 11-41392

fails—even if true—because Lopez co-mingled any legitimate funds and did produce records to un-mingle them.

• **Galaviz**

Here, the district court adopted the PSR, in which the PO had found that Galaviz had (i) opened seven bank accounts and used them to launder $509,665; (ii) received a $58,692 wire transfer from Magana for no apparent legitimate purpose; (iii) engaged in the various check transactions involving the Deer Ridge lot; and (iv) allowed Salas to buy a house in her name using drug trafficking proceeds. At a minimum, Galaviz is personally responsible for those transactions, which collectively involved more than $1,000,000 in illicit funds. Accordingly, Galaviz's liability for those transactions alone sufficiently supports her sentence.

That said, the court also noted additional "relevant conduct," which indicated that Galaviz knew Salas was a drug trafficker. *See Hammond*, 201 F.3d at 351 (citing U.S.S.G. § 1B1.3 (2010)). Specifically, the court noted that Galaviz (i) had been a signatory on the bank account of LC Contractors (Salas's sham construction company); (ii) had referred to Salas (her son) by his criminal alias in official documents; and (iii) had "flipped" Salas's Patron Loop house for a $150,000 profit. In light of the "appropriate deference" this Court affords the sentencing judge's loss determination, *see* U.S.S.G. § 2B1.1, cmt. n.3(C) (2010) (citation omitted), the above-recited evidence was more than sufficient to establish Galaviz's knowledge and hold her liable for all laundering of the $1,913,937 in drug trafficking proceeds. *See Hammond*, 201 F.3d at 351 ("A defendant's relevant conduct includes 'all reasonably foreseeable acts and omissions of others in furtherance of jointly undertaken criminal activity.'" (quoting U.S.S.G. § 1B1.3(a)(1)(B) (2010))).

For these reasons, we conclude that the district court did not err when it held Galaviz liable for the entire $1,913,937 laundered.

Nos. 11-41376 c/w 11-41392

- **Magana**

Magana contends that, at most, she should be liable for the $154,792 in funds that passed through Chase Account No. 7697, which she controlled. While Magana personally opened ten additional bank accounts during the time period applicable to this case, she asserts that those accounts were used for legitimate purposes and that at least some of them were opened jointly with either her ex-husband or current boyfriend.

The district court adopted the PSR, in which the PO had found that Magana had personally deposited $74,600 in cash into Chase Account No. 7697, but also had received a $52,130.51 wire transfer from Galaviz into that account. Magana worked at a hair salon at the time she deposited the $74,600 in cash, which greatly exceeded her legitimate income. Also, Galaviz lived with Magana at the time Galaviz transferred the $52,130.51. Magana was claiming Galaviz as a dependant for federal income tax purposes and, therefore, knew or should have known that Galaviz likely had not derived the $52,130.51 from legitimate sources.

Magana used the funds transferred from Galaviz (in addition to the cash Magana had previously deposited) to purchase an $80,000 CD. Upon the CD's maturation, Magana wired $25,000 of its proceeds to Becerra. She wired the remaining $58,692 of the proceeds back to Galaviz (specifically, to BBVA Compass Account No. 6826, which Galaviz controlled). There was no apparent purpose to this sequence of transactions other than to launder funds that somehow were illicit. Under *Hammond*, the district court did not err in holding Magana accountable for the reasonably foreseeable acts of her co-conspirators.

Judge Alvarez explained to Magana at the sentencing hearing that: (i) she did not "understand how [Magana] could not have known what [her] brother was doing"; (ii) laundering drug trafficking proceeds is "part of what makes these types of operations work"; and (iii) both launderers and traffickers are "equally

Nos. 11-41376 c/w 11-41392

responsible for the serious problem that we have, both on this side and on that side of the border." We agree. The district court did not err by holding Magana liable for the entire $1,913,937 laundered.

### ii. The District Court's Adoption of a "Sophisticated Laundering" Enhancement for Each ML Appellant

U.S.S.G. § 2S1.1 prescribes a 2-level enhancement for an offense that involved "sophisticated laundering." U.S.S.G. § 2S1.1(b)(3) (2010). "[S]ophisticated laundering means complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense." *Id.* § 2S1.1, cmt. n.5(A) (internal quotation marks omitted). "Sophisticated laundering typically involves the use of . . . (i) fictitious entities; (ii) shell corporations; (iii) two or more levels . . . of transactions . . . involving criminally derived funds that were intended to appear legitimate; or (iv) offshore financial accounts." *Id.*; *see also Fernandez*, 559 F.3d at 320.

#### • Lopez

Here, the district court found that Lopez had acknowledged that LC Contractors was a sham when she had conceded to CS1 that it was not in business "to make money." Moreover, the district court found that Lopez had used Via Italia to engage in a layered transaction—involving the purchase of a CD and the use of that CD as collateral for a loan. Finally, the district court found that bank accounts controlled by Lopez or Via Italia had been used to make wire transfers of large dollar values to and from accounts in Mexico controlled by drug traffickers. Because the district court's findings covered all of the indicia of "sophisticated" laundering provided in Note 5(A) of the Commentary to § 2S1.1, we conclude that it did not err by adopting the 2-level sentencing enhancement.

#### • Galaviz

Here, the same evidence set forth in Part VI.C.2.b *supra*, concerning Galaviz's challenge to the district court holding her liable for the entire $1,913,937 laundered, applies equally to the Note 5(A) indicia of "sophisticated laundering." Additionally, Galaviz shared control of IBC Account No. 0654 with Lopez. Between February 2008 and April 2008, that account received $27,970 in cross-border wire transfers from Becerra in Mexico. Galaviz and Lopez also shared control of BBVA Compass Account No. 1782. Between February 2008 and May 2008, that account received $245,995 in cross-border wire transfers from Becerra, Garza-Rodriguez, and Martinez-Garcia in Mexico. Altogether, this evidence implicated every Note 5(A) indicium of "sophisticated laundering." We therefore conclude that the district court did not err when it adopted the § 2S1.1(b)(3) sentencing enhancement.

- **Magana**

Here, as with Galaviz, the same evidence set forth in Part VI.C.2.b *supra*, concerning Magana's challenge to the district court holding her liable for the entire $1,913,937 laundered, applies equally to the Note 5(A) indicia of "sophisticated laundering." Together with the fact that Magana acted as a strawman for Galaviz in the Becerra wire transfer to Mexico, and that Magana used a CD to launder Galaviz's transferred funds, this evidence implicated almost all of the Note 5(A) indicia. We therefore conclude that the district court did not err when it adopted the sentencing enhancement.

### iii. The District Court's Denial of a "Minor Participant" Reduction to Lopez and Magana

U.S.S.G. § 3B1.2 prescribes a 2-level reduction if a "defendant was a minor participant in [the] criminal activity." U.S.S.G. § 3B1.2(b) (2010). A "minor participant" is a defendant who is "substantially less culpable than the average participant," but "whose role could not be described as minimal." *Id*. § 3B1.2, cmt. nn.3(A), 5.

Nos. 11-41376 c/w 11-41392

"When a defendant timely objects to a district court's failure to make a downward adjustment based on section 3B1.2, this court reviews [her] sentence for clear error." *United States v. Martinez-Larraga*, 517 F.3d 258, 273 n.12 (5th Cir. 2008). The defendant's participation level in the offense is not evaluated "in reference to the entire criminal enterprise of which [she was] a part." *United States v. Garcia*, 242 F.3d 593, 598 (5th Cir. 2001) (citation omitted). Rather, it is evaluated in reference to "that of an average participant." *Id.* (citation and internal quotation marks omitted). The defendant's role was not minor if it was "actually coextensive with the conduct for which [she] was held accountable." *Id.* at 598-99 (citations omitted).

The defendant "bears the burden of proving, by a preponderance of the evidence, her minor role in the offense." *United States v. Zuniga*, 18 F.3d 1254, 1261 (5th Cir. 1994) (citation omitted). "The sentencing court is free to consider all relevant evidence, even inadmissible evidence, in determining whether an adjustment is warranted so long as the evidence has . . . sufficient indicia of reliability to support its probable accuracy." *United States v. Miranda*, 248 F.3d 434, 446 (5th Cir. 2001) (citation and internal quotation marks omitted).

- **Lopez**

Here, Lopez argues that because she played a lesser role in the money laundering scheme than did Salas, her role was "minor" within the meaning of § 3B1.2(b) even if not "minimal" within the meaning of § 3B1.2(a). This reasoning is flawed. After all, it only shows that Lopez was an average participant, rather than the organizer or leader. The district court found that, at a minimum, Lopez personally opened ten Wells Fargo bank accounts and laundered $361,934 in drug trafficking proceeds. Thus, her role was not "substantially less" than the other participants. We therefore conclude that the district court did not err by denying § 3B1.2(b)'s 2-level reduction.

- **Magana**

50

Nos. 11-41376 c/w 11-41392

Here, even though Magana's name is on fewer incriminating documents than those of Lopez and Galaviz, it is apparent that Magana played at least an average role in the money laundering conspiracy, and certainly not a "substantially lesser" one. After all, the district court found that Magana had opened eleven of the 38 bank accounts used in the conspiracy and had engaged in direct contact with Becerra in Mexico. Accordingly, the district court did not clearly err in denying Magana the § 3B1.2(b) sentencing reduction.

> ### iv. The District Court's Denial to Lopez of a Downward Departure Under the U.S.S.G. § 5H1.6 "Family Ties and Responsibilities" Policy Statement

The district court declined to grant a downward departure for "family ties and responsibilities" because Lopez and Salas had knowingly risked the possibility their children would be left parentless by engaging in their criminal activities. Lopez challenges this denial. However, her challenge is foreclosed as a matter of law.

We have "jurisdiction to review a district court's decision not to depart downward from the guideline range only if the district court based its decision upon an erroneous belief that it lacked the authority to depart. . . . [S]omething in the record must indicate that the district court held such an erroneous belief." *United States v. Landerman*, 167 F.3d 895, 899 (5th Cir. 1999) (citations omitted). Here, nothing in the record indicates that the district court erroneously believed that it lacked authority to grant a departure. Indeed, the district court expressly explained that a departure was unwarranted. Thus, this challenge is beyond our jurisdiction. We reject it without reaching the merits.

> ### v. The Sufficiency of the District Court's Consideration of the 18 U.S.C. § 3553(a) Factors with Respect to All Three ML Appellants

We conclude that the district court's consideration of the various § 3553(a) factors was sufficient.  The district court, for example, noted its consideration of the principle that Lopez, Galaviz, and Magana should be sentenced similarly for similar crimes.  *See* 18 U.S.C. § 3553(a)(6).  Judge Alvarez also made the following two statements in open court:  (i) "The Court has, in preparing for the sentencing, also gone back and reviewed the 3553 factors as it does in every single case"; and (ii) "The Court, as I touched on, has considered the 3553 A factors."  At least on the specific facts of this case, this amounted to sufficient consideration of the § 3553(a) factors as to the three ML Appellants.

Additionally, to the extent the Appellants challenge the district court's denial of a downward departure under the § 3553(a) factors, rather than just the sufficiency of the court's consideration of those factors, that challenge is not reviewable.  *See Landerman*, 167 F.3d at 899 (citations omitted).

## VII.   Applicability of the Cumulative Error Doctrine

The final issue on appeal is whether the cumulative error doctrine applies to this case.  The cumulative error doctrine "essentially summarizes the other issues raised" in an appeal.  *See United States v. Stephens*, 571 F.3d 401, 411 (5th Cir. 2009) (footnote omitted).  Under the doctrine, "relief may be obtained only when constitutional errors so fatally infect the trial that they violate the trial's fundamental fairness."  *Id.* at 412 (citations and internal quotation marks omitted).  Where a defendant-appellant "has not established any error . . . there is nothing to cumulate."  *See United States v. McIntosh*, 280 F.3d 479, 484 (5th Cir. 2002) (citation omitted).

Here, other than as discussed *supra* regarding the statutory maximum sentence used for Count 10, Appellants have not established any errors—let alone constitutional errors that infringe upon fundamental fairness.  We therefore conclude that the cumulative error doctrine does not apply.

### CONCLUSION

Nos. 11-41376 c/w 11-41392

For the foregoing reasons, we wholly AFFIRM Alaniz's convictions and sentences. Due to a Sentencing Guidelines error conceded by the government, we VACATE the sentences of Salas, Lopez, Galaviz, and Magana as to Count 10 only, and REMAND for re-sentencing. We otherwise AFFIRM the convictions and sentences in full.

## APPENDIX

### A.    The Indictment

Appellants were charged by the following sixteen-count indictment:

| Count | Charge | Statutes Implicated | Appellants Implicated |
|---|---|---|---|
| 1 | Conspiracy to possess with intent to distribute (a) over 5 kg. of cocaine; and (b) over 1000 kg. of marijuana | Unlawful Act: 21 U.S.C. § 841(a)(1)<br><br>Penalty: 21 U.S.C. § 841(b)(1)(A)<br><br>Conspiracy: 21 U.S.C. § 846 | Salas; Alaniz |
| 2 | Dismissed prior to trial | | |
| 3 | Possession with intent to distribute over 5 kg. of cocaine on July 18, 2006 | Unlawful Act: 21 U.S.C. § 841(a)(1)<br><br>Penalty: 21 U.S.C. § 841(b)(1)(A)<br><br>Aiding & Abetting: 18 U.S.C. § 2 | Salas; Alaniz |

Nos. 11-41376 c/w 11-41392

| 4 | Possession with intent to distribute over 5 kg. of cocaine on February 26, 2007 | Unlawful Act: 21 U.S.C. § 841(a)(1) <br><br> Penalty: 21 U.S.C. § 841(b)(1)(A) <br><br> Aiding & Abetting: 18 U.S.C. § 2 | Salas |
|---|---|---|---|
| 5 | Possession with intent to distribute over 100 kg. of marijuana on February 27, 2007 | Unlawful Act: 21 U.S.C. § 841(a)(1) <br><br> Penalty: 21 U.S.C. § 841(b)(1)(B) <br><br> Aiding & Abetting: 18 U.S.C. § 2 | Salas |
| 6 | Possession with intent to distribute over 1000 kg. of marijuana on September 18, 2007 | Unlawful Act: 21 U.S.C. § 841(a)(1) <br><br> Penalty: 21 U.S.C. § 841(b)(1)(A) <br><br> Aiding & Abetting: 18 U.S.C. § 2 | Salas |

Nos. 11-41376 c/w 11-41392

| 7 | Possession with intent to distribute over 100 kg. of marijuana on October 10, 2007 | <u>Unlawful Act</u>: 21 U.S.C. § 841(a)(1)<br><br><u>Penalty</u>: 21 U.S.C. § 841(b)(1)(B)<br><br><u>Aiding & Abetting</u>: 18 U.S.C. § 2 | Salas |
|---|---|---|---|
| 8 | Possession with intent to distribute over 100 kg. of marijuana on October 18, 2007 | <u>Unlawful Act</u>: 21 U.S.C. § 841(a)(1)<br><br><u>Penalty</u>: 21 U.S.C. § 841(b)(1)(B)<br><br><u>Aiding & Abetting</u>: 18 U.S.C. § 2 | Salas |
| 9 | Possession with intent to distribute over 1000 kg. of marijuana on December 21, 2009 | <u>Unlawful Act</u>: 21 U.S.C. § 841(a)(1)<br><br><u>Penalty</u>: 21 U.S.C. § 841(b)(1)(A)<br><br><u>Aiding & Abetting</u>: 18 U.S.C. § 2 | Salas |

Nos. 11-41376 c/w 11-41392

| 10 | Conspiracy to launder the proceeds of drug trafficking (a) so as to conceal the nature, location, and source of the proceeds; (b) so as to avoid a transaction reporting requirement; and (c) by moving or attempting to move monetary instruments and funds from the United States to a place outside the United States. (d) Conspiracy to knowingly engage in monetary transactions, affecting interstate commerce, in criminally derived property of a value greater than $10,000, such property having been derived from drug trafficking. | Unlawful Acts & Penalties: 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(1)(B)(ii), 1956(a)(2)(B)(i), 1957 <br><br> Conspiracy: 18 U.S.C. § 1956(h) | Salas; Lopez; Galaviz; Magana |
|---|---|---|---|

Nos. 11-41376 c/w 11-41392

| 11 | Knowingly engaging in a monetary transaction in criminally derived property of a value grater than $10,000, on April 17, 2007, such property having been derived from drug trafficking | <u>Unlawful Act & Penalty</u>: 18 U.S.C. § 1957 <br><br> <u>Aiding & Abetting</u>: 18 U.S.C. § 2 | Lopez |
|---|---|---|---|
| 12 | Knowingly engaging in a monetary transaction in criminally derived property of a value grater than $10,000, on March 27, 2007, such property having been derived from drug trafficking | <u>Unlawful Act & Penalty</u>: 18 U.S.C. § 1957 <br><br> <u>Aiding & Abetting</u>: 18 U.S.C. § 2 | Magana |
| 13 | Knowingly engaging in a monetary transaction in criminally derived property of a value grater than $10,000, on January 23, 2008, such property having been derived from drug trafficking | <u>Unlawful Act & Penalty</u>: 18 U.S.C. § 1957 <br><br> <u>Aiding & Abetting</u>: 18 U.S.C. § 2 | Galaviz |

| 14 | Knowingly engaging in a monetary transaction in criminally derived property of a value grater than $10,000, on April 17, 2008, such property having been derived from drug trafficking | Unlawful Act & Penalty: 18 U.S.C. § 1957  Aiding & Abetting: 18 U.S.C. § 2 | Galaviz |
|---|---|---|---|
| 15 | Knowingly engaging in a monetary transaction in criminally derived property of a value grater than $10,000, on April 17, 2008, such property having been derived from drug trafficking | Unlawful Act & Penalty: 18 U.S.C. § 1957  Aiding & Abetting: 18 U.S.C. § 2 | Salas |
| 16 | Knowingly engaging in a monetary transaction in criminally derived property of a value grater than $10,000, on September 18, 2009, such property having been derived from drug trafficking | Unlawful Act & Penalty: 18 U.S.C. § 1957  Aiding & Abetting: 18 U.S.C. § 2 | Galaviz |

### B.    Convictions/Acquittals

Appellants were convicted or acquitted as follows:

| Appellant | Counts Convicted | Counts Acquitted |
|---|---|---|
| Salas | 1; 3; 4; 6; 7; 8; 9; 10; 15 | 5 |
| Alaniz | 1; 3 | |
| Lopez | 10; 11 | |
| Galaviz | 10; 13; 14 | 16 |
| Magana | 10; 12 | |

### C.    Sentences

Appellants were sentenced as follows:

| Appellant | Counts Convicted | Sentences (concurrent) |
|---|---|---|
| Salas | 1 | Life imprisonment |
| | 3 | |
| | 4 | |
| | 6 | |
| | 9 | |
| | 7 | 40 years imprisonment |
| | 8 | |
| | 10 | 20 years imprisonment |
| | 15 | 10 years imprisonment |

Nos. 11-41376 c/w 11-41392

| Alaniz | 1 | 30 years imprisonment |
|---|---|---|
| | 3 | |
| Lopez | 10 | 11 years, 3 months imprisonment |
| | 11 | 10 years imprisonment |
| Galaviz | 10 | 11 years, 3 months imprisonment |
| | 13 | 10 years imprisonment |
| | 14 | |
| Magana | 10 | 11 years, 3 months imprisonment |
| | 12 | 10 years imprisonment |